**SUMITOMO ELECTRIC INDUSTRIES, LTD.; and Sumitomo Electric Lightwave Corp; Plaintiffs,**

v.

**CORNING, INCORPORATED, Defendant.**

**No. 1:00CV00863.**

United States District Court, M.D. North Carolina.

Sept. 11, 2001.

Michael E. Ray, Christopher G. Daniel, Womble, Carlyle, Sandridge & Rice, Winston-Salem, NC, Peter A. Veytsman, Gary M. Hoffman, Charles W. Saber, Mark J. Thronson, Dickstein, Shapiro, Morin & Oshinsky, LLP, Washington, DC, for Plaintiffs.

Dixie Thomas Wells, James Donald Cowan, Jr., Smith, Helms, Mulliss & Moore, LLP, Greensboro, NC, Daniel M. Gantt, Duane-David Hough, Paul B. Keller, Anna A. Kobilansky, Fish & Neave, New York City, for Defendant.

## MEMORANDUM OPINION

BULLOCK, District Judge.

This matter is before the court on a motion by Defendant Corning Incorporated ("Corning") to dismiss a claim for declaratory judgment brought by Plaintiffs Sumitomo Electric Industries, Ltd., and Sumitomo Electric Lightwave Corp. (collectively "Sumitomo"). Corning contends that this court lacks subject matter juris-

diction over Sumitomo's declaratory judgment claim and therefore the claim should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1). For the following reasons, Corning's motion to dismiss will be denied.

### FACTS

Sumitomo and Corning are leaders and competitors in the optical fiber industry. Both companies own portfolios of patents relating to optical fiber and optical fiber products. Within Corning's patent portfolio is United States Patent No. 5,361,319 ("the '319 patent"), entitled "Dispersion Compensating Devices and Systems."

In May 1999, Corning's corporate counsel sent a letter to Sumitomo stating that Sumitomo was infringing the '319 patent. The letter requested that Sumitomo send written assurance to Corning that Sumitomo would cease the offer and sale of infringing products in the United States.

Sumitomo responded to Corning's "cease and desist" letter by requesting more information regarding the specific products that Corning considered to infringe the '319 patent. Corning notified Sumitomo that Sumitomo's Negative Dispersion Compensating Fiber Module infringed the '319 patent. Through a series of correspondences the parties specified the individual claims of the '319 patent involved in Corning's allegation of infringement.

Starting in the late summer of 1999, representatives from Corning and Sumitomo met on several occasions to discuss the allegation of infringement and potentially to negotiate a license under the '319 patent. Both parties expressed a desire to resolve the situation through a business agreement, rather than through prolonged litigation. Prior to and during these meetings, Sumitomo notified Corning that it hoped to negotiate a worldwide license under the '319 patent for Dispersion Compensating Fiber ("DCF") *cable* in addition to a license for DCF *modules*.[1] Corning expressed an unwillingness to grant a license for DCF cable, stating that the '319 patent had significant value to Corning with respect to the DCF cable market.

Corning's prior communications with Sumitomo had not directly alleged infringement of the '319 patent based on Sumitomo's offer and sale of DCF cable. In fact, Corning states that until September 2000, when Sumitomo filed the present lawsuit, Corning had no knowledge that Sumitomo planned to produce or sell DCF cable in the United States. Sumitomo argues, however, that even though Corning made no direct allegation of infringement with respect to DCF cable, the specific patent claims allegedly infringed by Sumitomo's DCF module necessarily implicated the DCF cable that Sumitomo was also then producing. Therefore, in Sumitomo's view, the "cease and desist" letter in combination with the specific patent claims allegedly infringed by Sumitomo's DCF module amounted to a threat of suit as to DCF cable as well as to DCF modules.

After several unsuccessful attempts to negotiate a license under the '319 patent for its DCF module product, Sumitomo

---

1. Dispersion Compensating optical fiber is produced in multiple forms, including raw fiber, DCF cable, and DCF modules. Raw fiber usually means a single strand of optical fiber and is sometimes referred to as "on the reel." DCF cable is comprised of several parallel strands of raw fiber bundled into a cable and covered by a protective sleeve. (Mem. of Def. Corning in Supp. of Mot. to Dismiss [Doc. # 9] at 4 n.*). DCF modules are basically boxes that contain a certain length of raw fiber. The modules protect the raw fiber and permit it to be connected to an optical fiber that generates dispersion. (Horima Decl. [Doc. # 17] at ¶ 6).

filed a previous lawsuit with this court on November 22, 1999, seeking a declaration that the '319 patent was invalid or not infringed.[2] Sumitomo never served the complaint from the November 1999 lawsuit, though, and that suit lapsed. After further negotiations, the parties eventually came to terms and executed a license agreement for Sumitomo's DCF module.

Sumitomo approached Corning two months after entering the DCF module license and again expressed interest in obtaining a license under the '319 patent for DCF products other than the DCF module. Sumitomo faxed proposed terms for such a license to Corning. Sumitomo claims that Corning never replied to these proposed terms, and Sumitomo interpreted Corning's silence as a continued refusal to negotiate a license for DCF cable. In contrast, Corning states that at a meeting between the parties where other licensing matters were discussed, Corning indicated to Sumitomo that the proposed license terms were inadequate but that Corning would be open to further discussion. (Sicotte Decl. [Doc. # 11] at ¶ 6). Sumitomo's representative at that meeting professes no recollection of any such indication from Corning. (Horima Decl. [Doc. # 17] at ¶ 4). In any event, Sumitomo never submitted a revised proposal to Corning. Instead, Sumitomo filed the present action seeking declaratory judgment with respect to the '319 patent and claiming infringement by Corning of several patents owned by Sumitomo.

## ANALYSIS

■ The Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201(a), provides in pertinent part:

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

The DJA allows a party potentially liable for patent infringement to initiate suit rather than wait for the patentee to file for patent infringement. The right to bring a declaratory judgment claim is limited, however, by the requirement of an "actual controversy." *See* 28 U.S.C. § 2201(a) ("In a case of *actual controversy* ....") (emphasis added); *see also Spectronics Corp. v. H.B. Fuller Co., Inc.*, 940 F.2d 631, 633–34 ("The existence of an actual controversy is an absolute predicate for declaratory judgment jurisdiction."). Without an "actual controversy," federal courts have no jurisdiction to hear declaratory judgment claims. In patent litigation, a two-part test has been developed to determine whether an "actual controversy" exists: "[T]here is jurisdiction over a declaratory judgment action if (1) the declaratory plaintiff has acted, or has made preparations to act, in a way that could constitute infringement, and (2) the patentee has created in the declaratory plaintiff a reasonable apprehension of suit for infringement." *Serco Services Co., L.P. v. Kelley Co., Inc.*, 51 F.3d 1037, 1038 (Fed. Cir.1995). The declaratory plaintiff bears the burden of establishing the jurisdictional prerequisites by a preponderance of the evidence. *See Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 887 (Fed.Cir.1992). In the present case, Corning contends that neither of the jurisdictional prerequisites have been met.

---

**2.** The present action was filed by Sumitomo on September 7, 2000.

The first part of the jurisdictional test, the "present activity" element, is satisfied in the present case. Sumitomo has submitted a declaration by the general manager of its Optical Fiber Division stating that Sumitomo manufactures and sells various DCF products, including DCF cable, that potentially come within the claims set forth in the '319 patent. (*See* Horima Decl. at ¶ 6). The declaration also states that Sumitomo has sold DCF cable worldwide since mid–1999 and that in late 1999 Sumitomo sold DCF cable into the United States. (*Id.* at ¶¶ 8, 9). Furthermore, according to the general manager's declaration, Sumitomo has taken concrete steps to enhance its distribution and sale of DCF cable in the United States. These steps include issuing a press release detailing Sumitomo's intent to expand its DCF cable business in the United States and engaging in detailed discussions with potential domestic customers. (*Id.* at ¶ 10).

Corning argues that the general manager's bare assertion of sales of DCF cable into the United States, without any additional proof of those sales, does not satisfy Sumitomo's burden. Moreover, Corning contends that Sumitomo has provided no information regarding the design of Sumitomo's DCF cable which would show whether the cable comes within the scope of the '319 patent's claims. Finally, Corning maintains that Sumitomo fails the "present activity" requirement for declaratory judgment because Sumitomo has presented no evidence indicating that Corning knew about Sumitomo's production, offer, or sale of DCF cable.

■ The uncontradicted declaration by Sumitomo's general manager concerning the sale of DCF cable into the United States and the potentially infringing nature of that DCF cable satisfies the "present activity" element of the jurisdictional test. *See Arrowhead Indus. Water, Inc. v.*

*Ecolochem, Inc.,* 846 F.2d 731, 739 (Fed. Cir.1988) (finding that an unchallenged affidavit provided sufficient evidence to meet the "present activity" element). Although the general manager's declaration does not provide specific sales data, the court has no reason to doubt the validity of his assertion that sales have occurred. In addition, the general manager's declaration states that the fiber in Sumitomo's DCF cable has "a dispersion of less than –20 PS/NM–KM and an attenuation of less than 1 DB/KM." (Horima Decl. at ¶ 9). This would potentially bring the fiber (and the cable) within the claims of the '319 patent. Finally, Corning's argument regarding its lack of knowledge as to any activity by Sumitomo in the DCF cable field has no bearing on the "present activity" element of the jurisdictional test. The "present activity" element focuses on the conduct of the declaratory plaintiff, not the knowledge of the patentee. *See BP Chems. Ltd. v. Union Carbide Corp.,* 4 F.3d 975, 978 (1993) (stating that the "present activity" element "depends on the conduct of the asserted infringer"). Consequently, Sumitomo has satisfied the first element of the jurisdictional test.

■ The second part of the jurisdictional test conversely focuses on the patentee's conduct. *See BP Chems.,* 4 F.3d at 978–79 ("[I]t is the objective words and actions of the patentee that are controlling."). Whether the declaratory plaintiff had a "reasonable apprehension" of suit depends on the actions of the patentee. The patentee need not directly threaten a lawsuit to create a reasonable apprehension on the part of the declaratory plaintiff. *Id.* at 979 ("Indirect threats or actions that place the declaratory plaintiff in reasonable apprehension of suit will meet the test for a declaratory judgment action."). Absent a direct threat of suit, the court must consider the "totality of the circumstances" to

determine whether an objectively reasonable apprehension of suit on the part of the declaratory plaintiff existed. *See Arrowhead*, 846 F.2d at 736.

■ Although Corning never directly threatened an infringement suit based on Sumitomo's offer or sale of DCF cable, considering the "totality of the circumstances," apprehension of such a suit was objectively reasonable. Several factors created Sumitomo's reasonable apprehension of an infringement suit based on its DCF cable product. The most important of these factors is an indirect allegation of infringement created by the combination of the "cease and desist" letter and the specific claims of the '319 patent allegedly infringed by Sumitomo's DCF module. These particular claims of the '319 patent pertain to Sumitomo's DCF cable as well as its DCF module. Therefore the allegation of infringement as to the module constituted an indirect allegation of infringement as to Sumitomo's DCF cable.

Correspondence from Corning following the "cease and desist" letter identified Sumitomo's DCF module as the allegedly infringing product referred to in the letter. The letter itself contained only a general allegation of infringement. In pertinent part, the letter stated:

It recently came to our attention that you are offering for sale, in the U.S., products that infringe one or more claims of the ['319] patent. We have enclosed a copy of the patent.

Please respond by giving us your written assurance that you will immediately cease the offer and sale of these products in the United States.

(Alden Decl. [Doc. # 10], Ex. A). Sumitomo responded to the "cease and desist"

letter by requesting clarification as to the exact products that Corning alleged to infringe the '319 patent. Corning replied to this request by stating, "[P]lease be advised that your Dispersion Compensating Fiber Module ... directly infringes many of the earlier claims of the ['319] Patent." (Alden Decl. Ex. C). No other Sumitomo products were specifically mentioned in this or any subsequent communications. With no other products directly alleged to infringe the '319 patent, Corning argues that analysis of the "cease and desist" letter should end with the identification of the DCF module as the offending product. To stop the analysis at that point, however, ignores subsequent communications from Corning specifying the particular claims of the '319 patent infringed by the module. These claims and the common characteristics between Sumitomo's DCF module and DCF cable necessarily implicated Sumitomo's DCF cable.

After pinpointing the DCF module as the allegedly infringing product, the parties agreed to meet to discuss their positions regarding the allegation. In preparation for these meetings, the parties identified the claims of the '319 patent that Sumitomo's DCF module potentially infringed. Corning stated that Sumitomo's DCF module infringed Claims 7 and 9 of the '319 patent. (*See* Toda Decl. [Doc. # 18] Ex. E). Both of these claims incorporate Claim 1 of the '319 patent.[3] Consequently, any allegation of infringement as to Claims 7 or 9 also presents a potential allegation of infringement as to Claim 1.

Claim 1 of the '319 patent describes the "raw fiber" which is a component of both the DCF module and the DCF cable. The raw fiber found in Sumitomo's DCF mo-

---

**3.** Claims 7 and 9 of the '319 patent both start: *"The fiber of Claim 1* comprising a centrally disposed core surrounded by a cladding glass." (*See* Pls.' Opp'n to Corning's Mot. to Dismiss, Ex. 1 at 19) (emphasis added).

dule and DCF cable is not identical, but the dispersion and attenuation of the raw fiber in both these products come within the range protected by Claim 1 of the '319 patent. (*See* Horima Decl. at ¶ 9). Therefore Sumitomo viewed an allegation of infringement as to its DCF module based on these particular claims of the '319 patent as an allegation encompassing its DCF cable.[4] Sumitomo's consistent attempts to negotiate a license for its DCF cable before, during, and after the negotiations involving the DCF module demonstrate Sumitomo's perception that the particular claims of the '319 patent allegedly infringed by the DCF module also applied to its DCF cable.[5] Based on the fact that the claims involved covered the raw fiber found in both products, that perception was objectively reasonable.

Corning argues that it could not have made any allegation of infringement relating to Sumitomo's DCF cable because Corning did not know about the product until it received service of the complaint in the present action. In addition, Corning states that even now it has not had an opportunity to examine and analyze Sumitomo's DCF cable and consequently Corning still could not make a good-faith allegation of infringement as to Sumitomo's DCF cable. Corning's lack of both knowledge and information about Sumitomo's DCF cable eliminates the possibility of a *direct* allegation of infringement, but not an *indirect* one. In effect, Corning's alle-

gation of infringement based on the particular claims of the '319 patent indirectly constituted an allegation of infringement as to Sumitomo's DCF cable. In determining the "reasonable apprehension" element of the jurisdictional test, the court must examine the conduct of the patentee and whether that conduct raised a reasonable apprehension of a patent infringement lawsuit on the part of the declaratory plaintiff. The patentee's intent or knowledge does not dictate the analysis, its conduct does. *See Arrowhead*, 846 F.2d at 738 ("[A] court may find a clear basis for a reasonable apprehension in all the circumstances, even when a patentee first learns of plaintiff's conduct upon receipt of the complaint."). In this case, Corning's allegation of infringement as to particular claims of the '319 patent was reasonably interpreted by Sumitomo to implicate its DCF cable product.

This indirect allegation of infringement could by itself establish a reasonable apprehension of suit on Sumitomo's part. Other factors, however, also contributed to such an apprehension. In particular, Sumitomo's failed efforts to negotiate a license for its DCF cable added to its apprehension of suit. On multiple occasions Sumitomo invited Corning to enter negotiations for a license under the '319 patent for DCF cable. Corning refused, at least initially, to license the '319 patent for this purpose. Prior to entering into the DCF

---

4. Corning contends that *Bioxy, Inc. v. Birko Corp.*, 935 F.Supp. 737 (E.D.N.C.1996) supports the proposition that an apprehension of suit as to one product does not extend to a declaratory plaintiff's other products. *Bioxy* is clearly distinguishable from the present case, however, in that the "other products" in *Bioxy* were not yet in existence or even contemplated. *Id.* at 742. In contrast, Sumitomo has already produced and sold products that potentially infringe the '319 patent.

5. Corning argues that Sumitomo's decision not to pursue the initial lawsuit filed with this court on November 22, 1999, indicates that any apprehension of suit on Sumitomo's part dissipated after the parties entered into the license agreement for DCF modules. Sumitomo explains that at the time the initial lawsuit was filed its volume of DCF cable sales did not justify the cost of pursuing litigation. The court hesitates to speculate about the potentially complex business motivations for allowing the initial suit to lapse.

module license, Corning presented a memorandum to Sumitomo stating that it was "not possible for Corning to grant any kind of license in DCF Cables. It was carefully considered, but ... this patent has significant value in this application area to Corning." (Toda Decl. Ex. H). In addition, the general manager of Corning's Photonic Technologies Division sent a letter to Sumitomo reiterating Corning's unwillingness to negotiate a license for DCF cable. The letter stated, "I understand that Sumitomo's preference is for a worldwide license to use the intellectual property embodied in the '319 patent for the manufacture and sale of dispersion-managed cable. Regretfully, it is not possible for Corning to grant a license for that use at this time." (Id. at Ex. I). Sumitomo responded to these declarations of Corning's unwillingness to license DCF cable by expressing its continued interest in negotiating a license for DCF modules and stating that "[t]he DCF cable issue will be discussed independently from the DCF module issue." (Id. at Ex. J).

Sumitomo later approached Corning on the issue of a license for DCF cable by faxing proposed terms for a license agreement to Corning. The parties dispute events after this fax. Sumitomo states that it never received any response from Corning. In light of Corning's previous refusals to license the patent for DCF cable purposes, Sumitomo understood the silence to constitute a continued refusal to negotiate. Corning presents a very different version of events. According to Corning, the parties met for other business discussions at which time Corning notified Sumitomo that "it was unlikely that Corning would grant a license under the '319 patent for cabled DCF products according to the terms proposed by Sumitomo, but that Corning remained open to discussing other proposals that would create sufficient value to Corning." (Sicotte Decl. at

¶ 6). Corning declares that it "suggested that Sumitomo should propose a specific business plan or relationship with Corning that would meet the objective of adding value to Corning's Optical Fiber business." (Id.). Sumitomo's representative present at the meeting denies any recollection of such a suggestion.

Regardless of whose version of events the court accepts, no further negotiations occurred. Sumitomo considered the license negotiations to have failed. Failed license negotiations have been found to support a declaratory plaintiff's reasonable apprehension of suit. See Oce–Office Sys., Inc. v. Eastman Kodak Corp., 805 F.Supp. 642, 646–47 (N.D.Ill.1992). Considering the numerous occasions that Sumitomo had unsuccessfully attempted to negotiate a license for the DCF cable, it was reasonable for Sumitomo to view Corning's apparent lack of response as a refusal to negotiate.

Corning cites Cygnus v. Therapeutics Sys. v. ALZA Corp., 92 F.3d 1153 (Fed. Cir.1996), overruled on other grounds by, Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059 (Fed.Cir.1998), for the proposition that a patent holder's refusal to grant a license does not contribute toward a reasonable apprehension of suit. It is true that a patentee is under no obligation to license a patent. "The patent statute grants a patentee the right to exclude others from making, using, or selling the patented invention." Cygnus, 92 F.3d at 1160 (citing 35 U.S.C. §§ 154, 271(a) (1994)). Cygnus held that a refusal to license a patent, standing alone, did not create a reasonable apprehension of suit. The declaratory plaintiff in Cygnus argued that certain statements made by the patent holder amounted to litigation threats. The court, however, deemed these statements to be common commercial banter. Id. Thus, the court was left with the issue

of whether "a reasonable apprehension of suit arises when a patentee does *nothing more* than exercise its lawful commercial prerogatives [by refusing to license]." *Id.* (emphasis added). The court held that a reasonable apprehension did not arise in such a situation.

In contrast, the present case involves a prior allegation of infringement. In addition, during various meetings and discussions Corning consistently communicated to Sumitomo the significant commercial value Corning placed on the '319 patent. (Toda Decl. at ¶ 12). Given this context, Sumitomo reasonably viewed Corning's apparent refusal to negotiate a license and statements regarding the value Corning placed on the patent as contributing to the likelihood of an infringement suit.

In addition to the indirect threat of suit and the failed attempts to negotiate a license, several other minor factors also added to Sumitomo's apprehension of suit. These include the fact that the "cease and desist" letter was sent by legal counsel, the history of litigation between the parties, and Sumitomo's knowledge of Corning's willingness to pursue litigation to protect the '319 patent.[6] *See Guthy–Renker Fitness, L.L.C. v. Icon Health & Fitness, Inc.,* 179 F.R.D. 264, 279 (C.D.Cal.1998) (legal counsel's authorship of letter alleging infringement affected "reasonable apprehension" analysis); *Goodyear Tire & Rubber v. Releasomers,* 824 F.2d 953, 955 (Fed. Cir.1987) (on-going legal dispute between the parties in state court influenced "reasonable apprehension" determination); *West Interactive Corp. v. First Data Res.,* 972 F.2d 1295, 1298 (Fed.Cir.1992) ("[A] patent owner's willingness and capacity to enforce its patent rights is pertinent to the

inquiry for an actual controversy ... [but] is not always conclusive."). While these factors alone might not have a determinative effect on the "reasonable apprehension" analysis, they provide context as to the "totality of circumstances" confronting Sumitomo at the time it filed the present action. Based on these factors, the indirect allegation of infringement, and the failed negotiation attempts, the totality of circumstances were such that Sumitomo had a reasonable apprehension of suit as to its DCF cable product.

### CONCLUSION

Sumitomo has satisfied both elements of the Declaratory Judgment Act's jurisdictional test. As a result, this court has jurisdiction, and Corning's motion to dismiss Sumitomo's declaratory judgment claim will be denied.

An order in accordance with this memorandum opinion shall be entered contemporaneously herewith.

---

6. Sumitomo states that Corning previously has sued Sumitomo and its subsidiaries in the United States for patent infringement. (*See* Toda Decl. at ¶ 12). In addition, according to Sumitomo, and not disputed by Corning, Corning has previously attempted to enforce its '319 patent in litigation against Furukawa Electric Co., Ltd. (*Id.*).